**UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
EASTERN DIVISION**

_____

IN RE:
BONNIE S. JOHNSON,                                     Chapter 7
        DEBTOR                                Case No. 04-20512-WCH
_____

LYNNE RILEY, CHAPTER 7 TRUSTEE,
        PLAINTIFF,
                                                        Adversary Proceeding
v.                                                      No. 06-01199

WILLIAM H. H. JOHNSON, III and
GAYLE A. JOHNSON,
        DEFENDANTS.
_____

**MEMORANDUM OF DECISION**

**I. INTRODUCTION**

The matter before the Court is the Chapter 7 Trustee's Assented[1] to Amended Motion for Reconsideration (the "Motion for Reconsideration") of the May 2, 2007 decision in which I ruled that the Chapter 7 Trustee (the "Trustee") could recover a portion of the money that Bonnie S. Johnson (the "Debtor") paid to the Defendant William H. H. Johnson ("Johnson") prepetition and entered judgment for Johnson and Gayle A. Johnson (collectively, the "Defendants") with respect to the fraudulent conveyance count. As grounds for the decision, I found that the Debtor never held a beneficial interest in the property she owned with Johnson. The Trustee asserts that reconsideration is warranted because unlike the cases which I cited in my decision, here there was

---

[1] The Chapter 7 Trustee filed her first Motion for Reconsideration on May 14, 2007. The Defendants assent only to the filing of the amended motion.

1

an intervening written trust which supercedes the original oral trust. The Trustee also seeks reconsideration of the number of payments I awarded. The Defendants filed an opposition, and I held a hearing and took the matter under advisement. For the reasons set forth below, I will enter an order granting the Trustee's Motion for Reconsideration.

## II. BACKGROUND

The present dispute arises from a series of transactions regarding real estate located at 304 Main Street, Plympton, Massachusetts (the "Property"). By way of background, in 1981, the Commonwealth of Massachusetts obtained a judgment (the "Judgment") against Johnson, and an recorded an execution in the Plymouth County Registry of Deeds.[2] As a result of the Judgment, the Plymouth County Sheriff sold several of Johnson's properties and applied the proceeds to satisfy the Judgment in part. It was Johnson's understanding, however, that any property he acquired over the next twenty years would be subject to the execution and sold.

In August of 1999, Johnson discovered and decided to buy the Property. Johnson visited the Property on several occasions and negotiated the price and purchase. He then asked the Debtor if she would put the Property in her name and obtain a mortgage. She agreed.

Johnson gave the Debtor $23,248 to pay the down payment. As proof, the Defendants introduced a receipt dated August 31, 1999, indicating a receipt of cash in the amount of $15,000 from Johnson to the Debtor,[3] and two checks totaling $4,900.[4] While this only amounts to $19,900, the Debtor adamantly asserts that she contributed no funds of her own to the purchase of the Property

---

[2] Plaintiff's Exhibit 19

[3] Defendant's Exhibit 2

[4] Defendant's Exhibits 3-4

and that any disparity between the documentation and the amount of the down payment are a result of Johnson's inadequate record keeping.

The Debtor purchased the Property on October 27, 1999 for $75,000.[5] By an instrument recorded October 29, 1999, the Debtor granted a mortgage to Crossland Mortgage Corp. ("Crossland") in the original principal amount of $60,000.[6]

Despite the Debtor's personal liability on account of the Crossland mortgage, the uncontradicted testimony is that Johnson paid the mortgage on the Property. At trial, the Debtor testified that Johnson either paid the mortgage directly to the mortgage company, or made the payment to her, which she forwarded to the company. The Defendants further introduced copies of checks demonstrating that Johnson made the monthly mortgage payments on the Property drawn from his personal checking account at Rockland Trust Company.[7] This practice continued until March of 2003. From 1999 until 2003, the Debtor reported the Property as "rental real estate property" for tax purposes and reported the mortgage payments she received from Johnson as "rental income" which she offset against various deductions, including those for mortgage payments, utilities, and depreciation.[8] As evidenced in her tax returns from 1999 to 2003, the Debtor reported losses ranging from approximately $2,000 to $6,000 related to the Property which she applied against her other reported income.[9]

On March 3, 2000, Johnson settled the Plympton Realty Trust (the "Trust") for the benefit

---

[5] Plaintiff's Exhibit 2

[6] Plaintiff's Exhibit 3

[7] Defendants' Exhibits 6, 7, and 8.

[8] Plaintiff's Exhibit 17

[9] *Id.*

3

of parties named in a "Schedule of Beneficial Interests" and named the Debtor and himself as trustees. On that same date, the Debtor and Johnson, as trustees, executed seven conflicting Schedules of Beneficiaries for the Trust.[10] With the exception of one, all schedules purported to give either Johnson or the Debtor some interest in the Trust corpus. Five schedules specifically provided the Debtor the following interests: a contingent life estate; a joint tenancy with a right of survivorship in a 100% beneficial interest; a 100% beneficial interest; a joint tenancy with a right of survivorship in a in a life estate; and a 100% beneficial interest in a life estate.[11] At trial, neither the Debtor nor Johnson adequately explained the existence of the seven conflicting Schedules of Beneficiaries. Johnson claimed not to know what a Schedule of Beneficiaries was; a somewhat dubious claim considering the testimony regarding his use of nominee trusts in the past. The Debtor claimed she merely signed what her lawyer told her to and that her understanding was that "if something happened to [her] [the Property] went to [Johnson]. If something happened to him it went to [the Debtor] and [her] brother and sister."[12] Contemporaneously with the creation of the Trust, the Debtor conveyed the Property to Johnson and herself as trustees of the Trust for "consideration of less than $100."[13]

On February 21, 2002, the Debtor and Johnson, in their capacity as trustees, reconveyed the Property to the Debtor for $1 for the purpose of refinancing the mortgage. By an instrument dated February 27, 2002, the Debtor, in her individual capacity, granted a mortgage to Homeside Lending,

---

[10] Plaintiff's Exhibit 7

[11] *Id.*

[12] Trans. May 1, 2007 at 77, ¶ 14-16.

[13] Plaintiff's Exhibit 8

Inc. ("Homeside") in the original principal amount of $110,000.[14] The HUD-1 Settlement Statement reflects that $59,435.17 was paid to Chase Manhattan Mortgage Corp., the assignee of Crossland, with an additional $2,727.60 in closing charges, while $47,837.23 was paid to the borrower.[15] The Defendants admit that the Debtor received approximately $30,000 from the refinancing, while Johnson received approximately $17,800. Both the Debtor and Johnson testified that the Debtor's receipt of the proceeds of the refinancing was with the prior permission of Johnson and that she considered it a loan from him.[16] On March 11, 2002, the Debtor reconveyed the Property back to the Trust for $1.[17]

Johnson testified that he used his portion of the refinancing proceeds for renovations to the Property, a process he started as early as September of 1999. Johnson testified that when he first saw the Property, it was a hunting cabin that had not been used for the past twenty-six years. He further testified that he personally completed many of the repairs himself, but when necessary, hired contractors to complete the renovations. On September 1, 1999, Johnson paid $4,276 to install a new septic tank.[18] On April 28, 2000, Johnson paid $500 to upgrade the electrical service to the

---

[14] Plaintiff's Exhibit 11

[15] Plaintiff's Exhibit 12

[16] The uncontroverted testimony of both the Debtor and Johnson was that up until she filed her Chapter 7 petition, the Debtor paid Johnson between $200 and $300 per month on account of this loan. The Debtor's bank statements were introduced evidencing payments made between June 10, 2004 and December 10, 2004. The August 10, 2004 statement also reflected an additional payment of $1,000 to Johnson for "Forklift B + D," but neither Johnson nor the Debtor could recall or explain this payment.

[17] Plaintiff's Exhibit 13

[18] Defendants' Exhibit 12

Property from overhead to underground.[19] On October 26, 2000 and November 3, 2000, Johnson retained Allen B. Ferguson to attach an addition to the cabin, install a new roof, install a kitchen sky light, and various other tasks for which he paid a total of $1,973.22.[20] On December 17, 2001, Johnson obtained a building permit from a the Town of Plympton for the installation of a wood burning stove.[21] Notably, Johnson is named as the owner of record of the Property on the permit.[22] Johnson also received a building permit for an antique store on January 28, 2002, and an above ground pool and ten-foot addition on April 29, 2002.[23] As with the first, Johnson is also listed as the owner of record on these three building permits.

On February 27, 2003, the Debtor and Johnson, in their capacity as trustees, conveyed the Property to the Debtor, Johnson, and Gayle A. DuBois as tenants in common for $1.[24] On March 14, 2003, the Debtor conveyed her one-third interest in the Property to Johnson and Dubois for $1.[25] The quitclaim deed recorded in the Plymouth County Registry of Deeds on March 18, 2003, expressly stated that the Defendants took "[s]ubject to mortgages of record which the grantees assume and agree to pay." The Debtor testified that an additional refinancing took place contemporaneously with this transfer in order to pay off her mortgage liability on the Property. No evidence supporting such a claim was admitted at trial.

---

[19] Defendants' Exhibit 13

[20] Defendants' Exhibits 14-15

[21] Defendants' Exhibit 9

[22] *Id.*

[23] Defendants' Exhibits 10-11

[24] Plaintiff's Exhibit 14

[25] Plaintiff's Exhibit 15

The Property was, however, subject to another refinancing on March 5, 2004, whereby Johnson and Dubois, now Gayle A. Johnson, granted a mortgage to Wells Fargo Home Mortgage Inc. in the original amount of $163,000 and paid off a mortgage held by National City Mortgage in the amount of $109,908.27, realizing net proceeds of $49,191.86.[26] On August 6, 2004, the Defendants sold the Property to Susan Lincoln and Dan C. Wood for $400,000, realizing net proceeds from the sale in the amount of $212,849.97.[27]

Throughout the history of these transactions the Debtor's financial situation slowly degraded. She testified that between 2000 and 2003, she was supporting her drug addicted former spouse and stepson. She also testified that during this period she was a litigant in a divorce in which her former spouse sought a $45,000 settlement. Additionally, in the Fall of 2003, the Debtor lost her one month old child, which dramatically affected her work and commissions. The Debtor also became the defendant in a state court defamation proceeding. Based upon the evidence submitted and the testimony given, it appears that as of 2003, the Debtor had approximately $421,000 in liabilities.[28]

The Debtor filed a Chapter 7 petition on December 28, 2004 and the Trustee was duly appointed. On March 27, 2007, the Trustee sued the Defendants seeking to avoid the fraudulent transfer of the Debtor's interest in the Property under Mass. Gen. Laws ch. 109A and to recover payments made to Johnson on account of the $30,000 proceeds from the February 28, 2002 refinancing under 11 U.S.C. § 547. On May 1st and 2nd, 2007, I conducted a two day trial at which

---

[26] Plaintiff's Exhibit 16

[27] Joint Pre-Trial Memorandum, ¶ V. M.

[28] $165,000 (Mortgage on the Debtor's Primary Residence) +$110,000 (Homeside Mortgage) + $16,000 (St. Anne's Credit Union) + $30,000 (Credit Cards) + $30,000 (Johnson) + $25,000 (Stanley's Defamation Claim) + $45,000 (Divorce Settlement).

7

four witnesses testified and forty-three exhibits were accepted into evidence. Though the seven Schedules of Beneficiaries was extraordinary and a troublesome matter, I found that while it may have been part of Johnson's scheme to hinder, delay and defraud the Commonwealth, it was not the Debtor's scheme. I found that there was no evidence that the Debtor benefitted from her ownership of the Property. The uncontradicted evidence demonstrated that Johnson provided the substantial portion of the down payment, if not more, and that he paid the mortgage. Further, Johnson signed the building permits as the sole owner, and treated the Property as his own. Relying on *Ward v. Grant*[29] and *In re Gustie*[30] for the proposition that when a fraudulent dealing results in the acquisition of title by the fraudster there is no transfer, I found that there was no fraudulent transfer of the Property. As I ruled that it was Johnson's property, I determined the $30,000 which the Debtor received on account of the refinancing was a loan which the Debtor made efforts to repay, as evidenced by the six $200 checks and the one $300. Because the Debtor made these payments to an insider within the year preceding the bankruptcy filing, and the Trustee established beyond any reasonable doubt that the Debtor was insolvent at that time, I found that these were fraudulent transfers under 11 U.S.C. § 548(a).[31]

---

[29] *Ward v. Grant*, 9 Mass. App. Ct. 364, 401 N.E.2d 160 (1980).

[30] *First Nat'l Bank of Boston v. Gustie (In re Gustie)*, 32 B.R. 466 (Bankr. D. Mass. 1983), *aff'd* 36 B.R. 473 (D. Mass. 1984) (the reconveyance of property by the trustee of an oral trust to the beneficiary is not a fraudulent transfer under Massachusetts law).

[31] I noted that at the beginning of my decision that in order for the Trustee to have rights against the proceeds of the real estate, she must establish a fraudulent transfer under 11 U.S.C. § 548 or the state law equivalent. The allegations made in the joint pretrial statement, which under my rule supersedes the pleadings, seek to show a violation of 11 U.S.C. § 548(a)(1)(A), that is, a transfer with actual intent to hinder, delay, or defraud any entity to which the debtor was, or became after the date of the transfer was made, indebted.

**III. POSITIONS OF THE PARTIES**

    A. The Trustee

The Trustee contends that I should reconsider my decision because the cases that I cited, *Ward v. Grant* and *In re Gustie*, are distinguishable from the present case because they do not involve an intervening written trust which contravenes the intent of the oral trust. She essentially contends that the effect of the settlement of the Trust was to either repudiate or terminate the oral trust.[32] As grounds, the Trustee points to the fact that the parties acted in contravention of the limited purpose of the oral trust, which was to avoid the Judgment, by deeding the Property from the Trust to the Debtor and both Defendants in February, 2003 because they never contemplated a transfer to third parties when they created the oral trust. Additionally, as the Judgment expired in 2001, the limited purpose of the oral trust terminated, and the Debtor should have conveyed the Property to Johnson at that time. Alternatively, in so far as I found that there was no transfer and therefore no remedy at law, the Trustee requests that I impose a constructive trust to prevent unjust enrichment in light of Johnson's fraudulent conduct.

The Trustee also seeks amendment of my judgment for the amount of recoverable payments made to Johnson.[33] She asserts that the admitted facts, as well as uncontroverted the testimony of the Debtor and Johnson at trial, established that the Debtor paid Johnson between $200 and $1000 per month for each of the twelve months prior to the filing of the Debtor's bankruptcy petition. The Debtor's bank statements showed total payments of $2,500 to Johnson for the period of May 2004

---

[32] *See Feeney v. Feeney*, 335 Mass. 534, 140 N.E.2d 642 (1957); *Thomson v. Stehle*, 367 Mich. 284, 116 N.W.2d 900 (1962).

[33] The Trustee in her complaint plead 11 U.S.C. § 547, but the judgment refers to fraudulent transfers under 11 U.S.C. § 548(a).

9

to December 2004. The Trustee argues that based upon the testimony of what the minimum payments were and that the Debtor never missed any payments, the award should be increased by $800 for additional payments made for the months of January, February, March, and April of 2004. This would bring the total recoverable amount to $3,300.

    B. The Defendants

The Defendants ask that I deny the Trustee's Motion for Reconsideration on the basis that the Trustee is simply rehashing the same arguments regarding the transfers that I already considered while ignoring the detailed testimony that Johnson and the Debtor gave regarding Johnson's ownership of the Property. Additionally, the Defendants assert that *Ward v. Grant* and *Gustie* are applicable to this case and the Trustee's attempts to distinguish them by citing evidence that the Property was placed in an express written trust with various alternating Schedules of Beneficiaries misses the point. They assert that the Property was always meant to be and always was Johnson's real estate. The Trustee did not prove a that the Debtor acted fraudulently with respect to transferring the Property and should not be allowed to apply Johnson's intent to avoid the Judgment in order to obtain a constructive trust. The Defendants argue that the Trustee has neither presented any newly discovered evidence nor established a manifest error of law and therefore the Court should not reconsider its decision.

## IV. DISCUSSION

I may reconsider a judgment upon the filing of a motion by a party within ten days of the entry of the judgment.[34] However, "[a] motion for reconsideration is not a means by which parties can rehash previously made arguments. . . . To succeed on a motion to reconsider, the Court requires

---

[34] *See* Fed. R. Civ. P. 59(e), made applicable to bankruptcy cases by Fed. R. Bankr. P. 9023.

that the moving party show newly discovered evidence or a manifest error of fact or law."[35] The Trustee contends that I made a manifest error of law by giving effect to an oral trust where there was a subsequent express written trust. On reconsideration, I agree.

An oral trust, like an express written trust, can be terminated or repudiated.[36] A termination can be accomplished by subsequent acts which are inconsistent with the intent and purpose of the trust.[37] In *Lipsitt v. Sweeney*, the Supreme Judicial Court of Massachusetts held that where the beneficiaries of an original trust agreed among themselves with the trustee that instead of receiving a formal distribution they would instead create a subsequent trust in full satisfaction of their distributive shares, the subsequent trust terminated the original trust.[38] The court reasoned that the conveyance of property to the second trust from the first was effectively a release of the beneficial interests in the first trust, leaving it without property to be administered and ripe for termination.[39]

In the present case, the execution of the Trust terminated the oral trust. Similar to the facts of *Lipsitt*, Johnson, the sole beneficiary under the oral trust, entered into an agreement with the Debtor, as the sole trustee, to transfer the corpus of the oral trust to the Trust. Once the Debtor deeded the Property to the Trust, the oral trust lacked a corpus and was therefore ripe for termination. Furthermore, the oral trust would also either have terminated by 2001 when the Judgment expired and its limited purpose ended or by February, 2003, when the Property was conveyed out of the Trust to third parties the parties to the oral trust never contemplated.

---

[35] *In re Wedgestone Fin.*, 142 B.R. 7, 8 (Bankr. D. Mass. 1992) (citations omitted).

[36] *See Feeney v. Feeney*, 335 Mass. 534, 140 N.E.2d 642 (1957).

[37] *See Thomson v. Stehle*, 367 Mich. 284, 116 N.W.2d 900 (1962).

[38] *Lipsitt v. Sweeney*, 317 Mass. 706, 711-712, 59 N.E.2d 465 (1945).

[39] *Id.*

Having reconsidered the oral trust, I agree that at the time of the February 2003 transfer, the Property was the corpus of the Trust and no longer subject to the terms of the oral trust. The question, which I did not consider at trial, is who were the beneficiaries of the Trust.

On March 3, 2000, Johnson settled the Trust and executed seven Schedules of Beneficiaries on the same day. The existence of these schedules is at best perplexing. This is clearly not the result of careful or deliberate estate planning. The Debtor suggests that it is the result of attorney negligence. Johnson can offer no explanation. If not negligence, there are perhaps two possibilities as to why seven inconsistent Schedules of Beneficiaries would be executed: uncertainty as to how the property should devolve or as part of a scheme to defraud. Based upon the fact that the Debtor has some kind of an interest in five of these schedules and that she testified that she understood that she had a beneficial interest in the Property, I find that the Debtor did indeed have a beneficial interest in the Trust. The exact nature of the interest is more complicated. Based upon the Debtor's description that "if something happened to [her] [the Property] went to [Johnson] [and] If something happened to him it went to [the Debtor] and [her] brother and sister,"[40] and a review of the existing Schedules of Beneficiaries, I conclude that the Debtor likely held a 50% beneficial interest in the Property.

Having concluded that the Debtor held a beneficial interest in the Trust that she subsequently transferred to the Defendants for nominal consideration in February and March of 2003, I must consider whether the Trustee established that these were fraudulent transfers. Massachusetts General Laws Chapter 109A provides in relevant part:

> A transfer made . . . by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made . . . if the debtor made the transfer . . . without receiving

---

[40] Trans. May 1, 2007 at 77, ¶ 14-16.

>a reasonably equivalent value in exchange for the transfer . . . and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer . . . .[41]

A creditor may avoid the such a transfer to the extent necessary to satisfy the creditor's claim.[42] A Trustee in bankruptcy may avoid any transfer of property by the debtor that is voidable by an unsecured creditor under applicable law.[43]

There is no question that at the time of the transfers the Debtor was insolvent. Nor is it disputed that the Debtor did not receive reasonably equivalent value in exchange for the transfers. As such, the Debtor's transfer of her beneficial interest in the Trust to the Defendants on February 27, 2003 and the subsequent transfer of her interest as a tenant in common in the Property to the Defendants on March 14, 2003 constituted fraudulent transfers under Massachusetts law. Accordingly, the Trustee may recover one-half the net cash proceeds of the March 5, 2004 refinancing, totaling $24,595.93, and one-half the net proceeds of the August 6, 2004 sale of the Property, totaling $106,424.98.[44]

Any concerns that this finding is either inequitable or inconsistent given my findings that the Defendants were the sole purchasers and occupants of the Property is alleviated given the role of Johnson and his scheme to defraud the Commonwealth in this case. As settlor of the Trust, Johnson was in a position to name the beneficiaries and determine their individual beneficial interests. It is

---

[41] Mass. Gen. Laws ch. 109A § 6(a).

[42] Mass. Gen. Laws ch. 109A § 8(a)(1).

[43] 11 U.S.C. § 544(b)(1).

[44] In her closing argument, the Trustee asserted the amount recoverable for the fraudulent transfer of the Debtor's interest in the Property was one-half the value of the net proceeds from the March 2004 refinancing and the August 2004 sale. The Defendants did not dispute that this accurately reflected the value of the Debtor's interest in the Property as of date of the fraudulent transfer in 2003. Therefore, I will value the Debtor's interest as the Trustee suggests.

hornbook law that a settlor need not receive consideration to exercise donative intent through creation of trust interests.[45] Johnson may have given the Debtor a beneficial interest in the Trust to protect its corpus from the execution on the Judgment, and likely assumed that when the Judgment was no longer an issue, the Debtor could simply "give" her interest back to him. Had she not been insolvent at the time of the retransfer, that is exactly what could have happened. But the Debtor was insolvent and not in a position to gift back the interest for less than reasonably equivalent value. Though he did not appreciate it at the time, this was chance Johnson took by involving the Debtor in his scheme. Unfortunately, he side stepped his own creditors only to run afoul of hers.

Having concluded that the Debtor held a beneficial interest in the Property which she fraudulently transferred to the Defendants, I need not impose a constructive trust to prevent unjust enrichment as alternatively argued by the Trustee in her Motion for Reconsideration. I must now consider, however, whether my decision with respect to the recoverable payments is now consistent with my amended findings.

Section 547 of the Bankruptcy Code allows the Trustee to avoid any transfer made to an insider within one year of the filing of the debtor's petition if that transfer is made on account of a pre-petition debt made while the debtor was insolvent and the transfer would enable the creditor to receive more than he would in a case under chapter 7.[46]

The Debtor and Johnson both testified that they considered the $30,000 proceeds received by the Debtor from the February 28, 2002 refinancing to be a loan from Johnson. At trial, I found that the parties treated it as such, and that the Debtor made efforts to pay it back. By agreement, the

---

[45] Restatement (Third) of Trusts § 15 (2003).

[46] 11 U.S.C. § 547(b).

14

Debtor borrowed $30,000 against their joint interest in the Property. As such, the Debtor owed Johnson an unsecured debt for the unpaid balance of the $30,000 loan.

The documentary evidence offered at trial shows that Johnson received six checks in the amount of $200 and one check in the amount of $300, totaling $1,500, on account of this loan between May 2004 to December 2004. Both Johnson and the Debtor adamantly asserted that the Debtor paid between $200 to $300 to Johnson every month for the entire year prior to the filing of her petition, but no evidence to support these four payments were introduced at trial. Because both the payor and the payee insist that at least $200 per month was paid and received, I will increase the amount recoverable by $800 to account for the January, February, March, and April 2004 payments.

The Trustee also asserts that the amount recoverable should be increased by $1,000 because a check for $1,000 written by the Debtor to Johnson appears on the August 10, 2004 statement. The memo line reflected that the payment was for "Forklift B + D," but neither the Debtor nor Johnson could recall this payment. Because there is no meaningful testimony regarding this payment, I decline to find that it is recoverable.

## V. CONCLUSION

In light of the foregoing, I will enter an order granting the Trustee's Motion for Reconsideration, vacate my order of May 2, 2007, and enter judgment for the Trustee in accordance with this Memorandum.

*William P. Hillman* (signature)

_____
William Hillman
United States Bankruptcy Judge

Dated: September 25, 2007